Good morning, Your Honors. Adam Vickers for the appellate, Tigeraire, Inc., and I respectfully request four minutes for rebuttal. Your Honors, Tigeraire seeks reversal of the District Court's denial of Tigeraire's motion to dismiss because the District Court does not have personal jurisdiction over Tigeraire, which is a Louisiana company. Tigeraire's, there are two reasons for that, Your Honor. First of all, Tigeraire's limited forum contacts did not cause harm in the forum, much less harm that Tigeraire would likely have known to be caused in the forum. Counsel, admittedly, we're at an early point in the pleading, but SDR clearly indicated that Tigeraire's efforts would require them to rebrand, basically, as I understood it, throw away a bunch of materials and so on, they'd have to change everything, which would have had a financial cost. They also allege that your pivot to the golfing industry was a specific effort to create a trademark dispute. Assuming that's true, why doesn't that support the exercise of personal jurisdiction in California? Yes, Your Honor, and this does get to the heart of the harm element. So, first of all, the harm that Sunday Red claims has not even manifested. It's not occurred yet. They've not taken any steps to change any of their sales. They're still selling products under their brand. Do they have to, excuse me, Counsel, do they have to do that in order to be, have a viable response to what you're claiming? Yes, Your Honor, there must be harm in the forum, and that harm must be caused by Tigeraire's forum contacts. We're reminded by what the Supreme Court said in Waldemar Fiore, which this court has acknowledged many times, that for personal jurisdiction to exist, the forum contacts must cause harm. Right, so Tigeraire sold some product. I think most of them were sold before the opposing counsel's client launched. That's correct, Your Honor. Of the 239, sold 239 products in California, and attended a couple trade shows. Are there other forum-related contacts? No, Your Honor, that's all. Tigeraire, it operates out of Baton Rouge, Louisiana. It's always operated from there. It's never had a presence in California. It launched a website, and as Your Honor pointed out, there have been roughly 2% of Tigeraire's total product sales, since it started doing business in 2020, have been to California buyers who bought online. What I'm trying to figure out, people talk in the briefing, they refer to this letter as a cease and desist letter. I'm not sure that that's a fair characterization of the letter. It didn't ask anybody to cease or desist anything, or mention litigation, but it did say, sort of introduce Tigeraire, show the two logos, which are very similar, or take the position there have been some instances of actual confusion, and then say, please contact us so we can discuss how to avoid confusion. This is problematic for me, because I think that's exactly what Yahoo, what we've said, we want people to be doing. That's the first issue. Let's pretend it's a cease and desist letter, and then we're looking at the other contacts. I think their harm has to be, as Judge Smith indicated, that your client is undertaking activities in California that are mark building. They say as much in their briefing, right? That is what they allege, Your Honor, and the reason why is because they want to draw this case into the impossible foods case construct. Impossible foods is really different, and I'll talk to the opposing counsel about impossible foods, but impossible foods had a physical presence in Southern California, and you never have, I don't think, or I don't see that in the record, that's one of my questions. That's correct, Your Honor, and that's why the impossible foods case, in which the court really, really stretched to find personal jurisdiction in that case, and over a very strong dissent from Judge Van Dyke as well, and very reasoned. Your Honor pointed out exactly our point, is that this is more of a common declaratory judgment of non-infringement circumstances that the courts are seeing more and more of now with all the e-commerce that's going on, where you have an out of state declaratory judgment defendant who is actually the aggrieved party. Well, you both claim to be aggrieved parties, and that, you know, in our line of work, we see that a lot, but that, I think their argument has to, because they're not claiming infringement. That's right, Your Honor. They haven't claimed infringement. I think they have to be arguing, as Judge Smith indicated, that your client has had contacts in California that is encroaching, eroding their mark, right, their common law mark. And to that point, you had some serious discussions, monetary discussions, where people tried to settle, which, of course, the courts like, but from their perspective, you made outrageous demands. You thought you had a hold on this market, and they didn't like it. You were talking about Taylor, Taylor Woodham, this big company, and basically everybody walked away because they thought you were making a strong ploy to get into golfing in California. What are we supposed to do to that? Does the fact that you all met, discussed, there were high dollar value claims, and nothing got settled, does that play into our analysis of whether there should be personal jurisdiction? No, Your Honor. The settlement discussions between the parties were, as Your Honor characterized, they were trying to resolve the case. And as Judge Christen pointed out, the letter that we sent in, which triggered those settlement negotiations, was not a fire and brimstone threatening, you better stop doing this now or else down comes the hammer. It invited the discussion to try and avoid any sort of infringement. But clearly SDR viewed it as a threat, otherwise they would not have entered into these discussions. And you all made some, I don't remember the exact dollar, but you made some very serious claims. If you want us to go away, basically, you got to pass X, isn't that correct? That is one way to characterize what brought us to the table and start discussing early settlement before litigation. Okay, but if this court is to hold that an out-of-state party's nominal commercial activities directed at the forum that otherwise do not cause any harm, if you were to hold that personal jurisdiction is simply because that out-of-state party sends a cease and desist, what can be characterized as a cease and desist letter, or a letter asserting their trademark rights, then practically speaking, what you're going to have is every out-of-state party who has launched a website or who has attended a trade show in California, instead of seeking early resolution of the conflict, they are going to sue first and ask questions later. So, counsel, there's another way to look at this case different than my colleagues have been talking about it. I'm not quite sure it's the right way to look at this case, but I want to present it to you and give you a chance to respond to it. So going through the complaint, I think that there are facts alleged that your client targeted Sunday Red specifically. So here are some of the facts. That there were other people out there using a similar mark, no enforcement action taken against them, that it wasn't until after the Sunday Red launched that your client's website changed to feature golf and apparel, that there was no selling of this mark by your client on apparel until after the demand letter or cease and desist letter or whatever letter we're going to call that happened. And then there are sales in California of apparel after that point. Well, actually, I don't know if we know exactly when the sale of apparel of California happened, but it was in 2024, somewhere in that window of time. So all of that looks like you could put it together and an inference can be drawn that your client saw that this is another actor out there with a similar mark in the apparel space, decides we're going to go into the apparel space and we're going to assert superior rights to them and make a huge monetary demand to get them to settle with us or go away or something like that. Why doesn't that look like Panavision? Well, Panavision, Your Honor, in that case, that was, first of all, a direct infringement case. Okay? You had an out-of-forum party who was allegedly infringing the forum party's copyrights. Well, if you accept the allegations here as true, I mean, trademark is all about not when did you design it first, but when did you use it first. And so their allegation is, we started using it on apparel. We launched. They heard that we launched. They started using it on apparel. We have superior rights. So they're not suing for infringement, but they are suing to say, court, resolve everybody's respective rights to these trademarks so that we can know how to go forward and do business. So under that theory, it's the same idea. You're using the mark that we used first. So we have superior rights to it. Your Honor, first of all, they do make that allegation. I agree. The district court rejected that allegation. The district court found that Tiger Air's letter or enforcement efforts, that there was nothing wrongful or abusive or tortious about those. Right, but we review this de novo, so that's what I'm trying to get at. What do you do with that theory and why? I guess, to restate the question, why isn't this analogous to Panavision? Because in Panavision, it was not a declaratory judgment case, and in Panavision you have a direct infringer who was the defendant. The defendant was being sued for infringement. In this case, Sunday Red filed a deck action, and Tiger Air, who's the party who's being infringed, is the one that's the defendant here. Well, who's infringing whom is up for grabs at this moment? Nobody knows. Well, Your Honor, respectfully, Sunday Red makes no allegations that Tiger Air has infringed their mark at all. It's just a deck action of non-infringement here, Your Honor. You think that the material difference is that they didn't also ask for a declaration that your company is infringing? There are no allegations that our company is infringing at all. If they had asked for a declaration of not only we're not infringing but those guys are, would it make a difference? Well, Your Honor, I mean, that's not the question that's before the court. Well, play it out for me. Would it make a difference? Well, to be honest with you, Your Honor, I don't know. I don't know what those allegations would look like. I'm trying to figure out what you think the material difference is. Is it the nature of the allegations? Is it the nature of the action? Is it the combination of the two? I don't know what your position is. The combination of the two, Your Honor. And the court made a factual finding, which is reviewable for clear error, in which Sunday Red has not challenged that there was nothing wrongful or tortious about Tiger Air's assertion of its rights, okay? So there are allegations of bad faith trademark rights creation, okay, which is there's no tort claim for that in there. This is just a deck action of non-infringement. That allegation, the district court rejected on a factual determination, okay, which is reviewable for clear error, which they did not challenge. It also, Your Honor, and this court has acknowledged many times recently in Yamashita, that in a personal jurisdiction context, bare allegations alone are not, cannot support jurisdiction. Only uncontroverted allegations can support personal jurisdiction. The parties did some informal discovery in this, in the motion practice before, and Tiger, I'm sorry, Sunday Red's counsel submitted a declaration to the court. I'm not remembering from the record that your client disputes that its website didn't change to feature golf until after this. We did, Your Honor. Where's that in the record? It was in, I'll find the record citation for you as well. But our client, the CEO of our client, Mr. Karavich, submitted a declaration and submitted evidence to support the declaration that shows that Tiger Air started selling apparel before Sunday Red ever started doing business. And Tiger Air targeted the golf industry, Tiger Air attended golf tournaments before Sunday Red ever started doing business. So those are controverted allegations supported only by Sunday Red's counsel's declaration and a few printouts that he got from the internet, okay. Those controverted, that controverted allegation cannot support personal jurisdiction alone. The court is bound to only look at the uncontroverted allegations. That's clear in the Yamashita case and in the cases that Yamashita cites. So Your Honor, what we're left with now is what Judge Christian was talking about, which is just Tiger Air's commercial activities, its sales of products, and its two weekend trade shows and its attendances in California to support harm. Well, wait a minute. Judge, if you could, Judge Smith asked something else, which is the subsequent activity that occurred after what I'm going to call a cease and desist letter for purposes of this question, that there were negotiations, that there was a demand, and so on and so forth. Is there any case law supporting that kind of contact in a personal jurisdiction analysis? Not that I am aware of, Your Honor. I mean, I don't believe Sunday Red cited any case law that says that there's some tortuous activity that would give rise to personal jurisdiction because the parties weren't able to reach an accord on what a settlement would look like before the case is filed. They have their opinion that Tiger Air made a demand that was too high, but in our view, the demand is along the lines of what the award would be, if not lower, if Tiger Air is to prevail. You're over your time, so I'm going to ask you to stop there. We'll put a minute on the clock when you come back. Thank you, Your Honor. You're welcome. And we'd like to hear from opposing counsel, please. Good morning, may it please the Court. My name is Adam Charnas, and I represent Sunday Red in this case. Now, I think it's important to focus on exactly what their argument is on the harm element, which is what counsel focused on, because if you look at their reply brief, they don't dispute the fact that if we suffered harm, that it was in California. They put all their eggs in the basket of there was no harm at all. But you're not alleging infringement, right? At this point, we're not alleging infringement, but the key point here is that we are, they claimed in their demand letter to us, or whatever you want to call it, the April 20, 24 letter. We can call it c-synthesis as long as we know what we're talking about. There's one letter. It's in each of those words, that letter. They claimed, they asserted they had common law rights. Common law rights arise from use, more than day, minimum use. So they're saying is you, Sunday Red, in California, your only operations, we have a website, but your only physical operations, your marketing activities are all focused on California. Right. And those things are violating our common law rights in California. And that is an admission, it's assertion, it's more than an admission. Counsel, it's exactly what we've asked people to do in YAHOO!, right? And then we've reaffirmed that recently in Impossible Foods, and what it, that's what is, as a threshold matter, it seems to me that you're now asking us to treat that as a contact that is very impactful for this analysis. Well, yes or no. YAHOO! says that a demand letter, cease and desist letter, by itself, if it's not abusive or cannot be the basis of personal jurisdiction, it doesn't say, as part of a panoply of evidence, it's not relevant. So what's the panoply? What else have you got? What we got here is their assertion that they have common law rights over their mark in California. Here's my problem. My concern is that your, and I don't see a limiting principle for your analysis. This seems to me to be a serious expansion of our case law regarding jurisdiction, because if people send the kind of letter that we have encouraged here, and there's not an allegation of harm in the form of infringement, then my concern is anybody who's selling a product can be, in another state, can be held into court. I completely agree with you. That's not our argument at all. Our argument here is that they began, as I think it was Judge Smith said, they began a campaign to attack our trademark, and that is sufficient harm. YAHOO! itself... Hold on. Hold on. So let's break that down. Judge Smith was asking you questions that had to do with the, I think, the conversations that went on after the, I'll call it the cease and desist letter, and you would agree, wouldn't you? That's not part of the analysis here? I think, I think you've conceded that point. Well, no, I don't... The settlement discussions are now part of the minimum contacts? YAHOO! says that the discussions to settle a cease and desist letter by itself is not sufficient for policy reasons. So I ask a different question, counsel, and the fact that you're not wanting to answer it is concerning to me. No. Your Honor, I will answer it directly. My question was... The discussions afterwards, in which they threaten our mark, and they say we have common law rights in California, based on our prior conduct in California, it has to be in California, it's location specific. That is an assertion that their mark trumps ours in California. Counsel, I'm waiting for an answer to my question. I'm sorry, Your Honor. The question is, we've encouraged, I read YAHOO! to say, we've encouraged this kind of letter. Yes. Okay? And we certainly don't want to discourage this kind of letter. Agreed. And then after that letter, in this case, what we understand from the pleadings is that the parties engaged in some negotiations. Discussions. Correct. Okay. Whatever. And I'm not trying to be flip. It's just whatever that was. Yes. I'm trying to figure out whether you think those communications contribute to the minimum contacts analysis here. I think the answer is no, with one exception.  And the exception is that they made an extortionate demand, and they basically said, and the amount is not in the record, Judge Smith, but they said, unless you pay this extremely large amount, we're going to keep on going after your mark. And that, that sort of creates the actual controversy under the Declaratory Judgment Act and Article 3 to allow it to be, to be in court. But I think what, what, what gives the court. You would make that determination because we want to look at the exchange of the settlement discussions? Well, I think it made an actual controversy, but that's not what supports the personal jurisdiction. Okay. Let's get to that part. What supports personal jurisdiction? How is this not a significant expansion of our case law? Well, it's, it's just Panavision. The court, this court is. Not Panavision. There's no. There's no allegation of infringement here. Well, there's no allegation of infringement by us against them. There is an allegation of infringement by them against us. But you bought a, bought a deck action. Correct. Because based on their allegation that they had established common law rights in California based, and common law rights are established based on more than de minimis use. That could have only been, happened based on their sales in California. But not all, and to make it perfectly clear, you know, they had a T-shirt, and this is controverted by affidavits in the record. I think the law in the Ninth Circuit is still that when there's controverted facts without an evidentiary hearing and a motion dismissed for personal jurisdiction, that all inferences are go to the plaintiff. And they had a T-shirt on the website at some point in the past. It was listed for years as being not available, and then it disappeared. And magically, these are allegations after Sunday Red launched, they all of a sudden had golf shirts and a whole bunch of attire, and they started marketing in, in the golf industry, including in, including in California. Now, and that, and we know that because they asserted common law rights in California. Judge Smith's trying to ask a question. I'm sorry. You know, I, I want to be sure I understand what happened in these negotiations. As my colleague has pointed out, we encouraged negotiations. That's not a problem. But you seem to be saying that the jurisdictional issue is resolved by virtue of the fact that Tiger, the Sunday Red, basically asserted common law rights in various things like T-shirts and so on, and that that occurred in California prior to anything else. Is that the basis of your personal jurisdiction claim? Well, we're asserting that Tiger Eric claimed. Their letter in April. I apologize. I misspoke. Tiger Eric claimed that. Yes. That's one element of it. Yes. Because, because common law rights only arise from more than de minimis use. So it's a concession that they had, that they had those activities in, in California. And we know that they had other, we know that they sold products, tens, thousands of dollars of products in California. We know they attended train shows. And they, and what Panavision says, and what this court's decision in Delphic says is, if you attack a company's trademark, the harm from that attack arises where they have its, the company has its principal place of business. Okay. We're talking about this meeting. Does the record reflect, in writing, everything that was said in the meeting and the discussions or is that just hearsay on all sides? No. The record does not, the record reflect, the record has the April 2024 letter. Right. And it has an affidavit from counsel for Sunday Red saying that a large demand for settlement was made, what, what we, what, what counsel, what we told the district court was that because of Rule 408, we were not putting in actually that, but if the court wanted us to, we would submit it in camera or under seal or whatever the court directed in the court. Because there were settlement discussions. Because there were settlement discussions. Right.  So, so, so the, the actual back and forth is not in the record other than the fact that it was the April letter and that there was a large, which we considered an extortion of settlement. But it was the common law claim that was the jurisdictional hook as far as you're concerned. It was the main jurisdictional hook which gets us in California because in order to have a common law right in California, you must have more than de minimis use in California. And we, and we know that there were sales in California, and we know that there were appearances in California. And just as importantly What, what discovery did you do on jurisdiction? There, there was, there was essentially, there was no formal discovery. We, the parties had informal requests, so the, we asked them for their sales in California and they produced that data to us informally. That was the extent of the discovery. About And neither party Sorry, go ahead, please. Would you I'm sorry to hear it. I'm sorry, go ahead. If discussions had not occurred between Tiger Air and Sundy Red in terms of settlement, would, would you still claim there was personal jurisdiction in California? Yes, to the extent that they're asserting common law rights in California, then personal jurisdiction would still exist. Now, if they hadn't reached out to us, I'm not sure we necessarily would have known that they were out there to file, but once they said, we're out here, we're claiming infringement, we want a large sum of money, and we're going to fight you, don't forget also they filed a TTAB opposition to our notice of registration. And this court in Delphix clearly said that a TTA opposition, TTAB opposition to a trademark registration causes harm to the registrant in its principal place of business, and, and Delphix was a declaratory judgment case. How many of the 239 products were sold in California before Sundy Red launched? It looks to me like the bulk of them were. Is that fair? That is fair. All right. What is the strongest case law supporting your position? You cite Impossible Foods, you cite, well, what is the strongest case law? Well, I think there are three cases that are all slightly different. Dole Food, Panavision, and Delphix. Dole Food says companies suffers harm where its principal place of business is located. Panavision says you suffer trademark, if there's an allegation of, of, it's your trademark. Are Delphix all infringement cases? Delphix was not an infringement case. I believe Delphix was a. You think it's a DEC action? I believe it was a DEC action. But I don't think that, the, the standard doesn't change. I mean, Impossible Foods was a declaratory judgment action. And it applied the ordinary, you know, purposeful direction test from Caller versus Jones. Yes, but to, to, to much more significant context. That's, that's why, that is my preoccupation here. I think this is a real expansion of our case law. You don't seem to be denying that. But I, could I ask you to, to, to address that directly? Well, let me answer it in two ways. Number one, it is much different than Impossible Foods. The facts are different. I don't think it's an expansion of the court's jurisprudence because of Panavision and Delphix, which say, if you attack a trademark, and Delphix says, you attack a trademark by filing an opposition at the TTAB, that causes harm where the trademark registrant, the applicant, has its principal place of business, and Sunday Red's principal place of business is California. What, what if the facts had been, you know, one of the facts that I mentioned before was, the allegation is that there were many people out there using Leaping Tiger designs, and Tiger Air only cares about Sunday Red's use of this, and only takes aggressive, or enforcement action against them. What if it had been different? What if Tiger Air had been going after all of them? Would you still be able to say personal jurisdiction in this case? Yes, because of the, because of the campaign that Tiger Air went on, as alleged, the campaign that they went on to attack our trademark. Now, if they did that with five companies instead of just us, they still would have had those, that campaign aimed at California to harm our trademark, which would have, would cause harm in California. Now, I think what, the fact that they didn't go after these five little companies, I think supports our argument that this was sort of an extortionate demand to try and get a lot of money from us, but I don't think it would, if they had gone after others for, for similar Leaping Tiger marks, I don't think it would have undermined our claim for jurisdiction in California, and. So can you, for me, I, I listed a laundry list of things that, you know, perhaps relate to contacts going to California. What is your laundry list? Give me the whole list that you think that we should rely on for, these are the contacts. Well, Your Honor, I think, I think, you know, you, you could have been, it could have been me speaking when you were speaking to my friend on the other side about giving sort of the, the whole theory that we have, and it's, it's not only the sales to California over a number of years, which they allege established common law rights. Number of years? Three, three, three years, three, four years. But the bulk of the sales were before Sunday Red launched. Right, but, but, Your Honor, that's what they are basing their, their assertion of common law rights on, right? Common law rights are, are, are, are, because you're using the mark in commerce more than they I understand. So that's why the sales before are relevant, because that's the only, in April of 2024, they sent a letter saying. Counsel, counsel, calm down, I understand. Okay. Okay, go ahead and answer your judge's question, please. So it's, it's the sales in California over several years, before and after. It's attending the trade shows in California before. It's pivoting toward the golf industry and the apparel industry once they became aware of the registration of our mark. And then it was the filing, ultimately, of the TTAB opposition in September of 2024, which precipitated the lawsuit, the declaratory judgment action that we file next day. And it just seems to me, since their only argument is, and they say this in their reply brief, their argument is not as to the situs of the harm, but the existence of harm. And they say there's no harm at all. It seems to me to be remarkable to argue that you can attack someone's trademark in all these ways, by selling goods in commerce, by filing a TTAB opposition, and not have, not impose harm on that party. One other thing I want to... So if those were to work for an affirmative tort claim of infringement, our case law sort of treats it as a tort, an affirmative claim of wrongdoing, maybe that laundry list works for there. But why, why does it also work in the DEC action when we're all reversed? And you're not actually seeking a declaration of your rights being impaired, infringed? Well, I think Impossible Foods deals with that question directly. Well, Impossible Foods is different in this case because, you know, there's sort of the two categories, the trademark building and the trademark enforcing conduct. Right. Impossible Foods is all about trademark building. You have very skinny trademark building here, and more trademark enforcing. And so one of the questions that we have to figure out in this case is, to what extent can trademark enforcing contact ever be relevant to a personal jurisdiction analysis in a DEC situation? And maybe any situation. May answer the question. Well, a couple of points. First of all, there's not a bright line between trademark enforcement and trademark building. Our case law has made a distinction. Well, there is a distinction. And there's a policy preference that goes to the trademark enforcing side that doesn't go to the trademark building side in terms of all this encouraging people to settle their disputes. Absolutely. My point is, there's not a hard and fast bright line. And that's shown by the fact that they assert a common law right here. So you can say, when they're building, when they're trademark building, getting to the common law right that they've asserted in the letter, that has the effect of allowing them to enforce that against us. So I think that's sort of how I would say that. But Impossible Foods also says expressly, it deals with the question about the jurisdictional issue. Where it says, the defendants, that's impossible. X's trademark building activities in California were integral to the scope of the rights that are to be clad in the case. So their trademark building activities in California, their development of the common law rights that they asserted, are integral to the scope of how broad or narrow those rights are in California. And that's what gives this court, or it gives the district court, jurisdiction in that context. Judge Smith, do you have any other questions? No, thank you. It looks like we're out of questions. Thank you so much for your patience with our questions, sir. Come on back, please. Thank you, your honors. First of all, a housekeeping measure. I owe the court a citation to the record. Mr. Karavich's declaration is ER 233 through 237. And I'm looking at it. So that's the only counter evidence that I should look at in the record in terms of your disagreement with the alleged facts? Yes, your honor. All right, so what's the key paragraph in there that you want, that you think- Hold on one second so I can pull it up. Okay, I'm there. Okay, so the point of that declaration and the evidence that was cited with it is to show that Tiger Air was selling apparel before Sunday Red started doing business, and that Tiger Air targeted the golf industry, attended golf tournaments before Sunday Red- Was that in California? No, your honor. It wasn't. It was simply, the golf tournament, if I recall correctly, was in Orlando. And I'll be honest with the court, I don't know where they sold apparel. I don't know from whom they bought or sold apparel. Does the declaration dispute the fact that the website's changing right around the time Sunday Red is launching? No, your honor. But the declaration does show that before Sunday Red started doing business, Tiger Air did- I understand that point, but I think when I was asking you before and I gave you my list of things, I understood you to say that the allegation about the change of the website now featuring golf was disputed, and therefore we couldn't rely on it in the complaint, and now I hear you saying something different. I'm sorry if I misspoke, your honor. I didn't mean to mislead the court. What is your position? Our position is that Tiger Air targeted the golf industry and was selling apparel before Sunday Red started doing business. So there is no way that Sunday Red can support its allegation that Tiger Air then, after Sunday Red formed, rushed to manufacture some dispute. But it was in response to launch. It was not in response to the launch is what you're saying. That's right, your honor. Okay. You are over time again, but we keep taking you over time. Judge Smith, do you have any additional questions? No, I don't. Thank you. Judge Forrest, are you set? Okay. Thank you both for your argument. Thank you, your honor. And for your advocacy. We appreciate it very much. We'll take that case under advisement.
judges: SMITH, CHRISTEN, FORREST